ATTACHMENT - 1



# TRIBAL EXECUTIVE COMMITTEE
P.O. BOX 305  •  LAPWAI, IDAHO 83540  •  (208) 843-2253

June 5, 2019

**SENT VIA OVERNIGHT DELIVERY, SIGNATURE REQUIRED**

Mr. Stephen Quin
President and CEO
Midas Gold Corp.
999 West Hastings St., Ste 890
Vancouver, British Columbia V6C 2W2

Corporation Services Company
Registered Agent for
Midas Gold Idaho, Inc.
12550 W. Explorer
Boise, ID 83713

Corporation Service Company
Registered Agent for
Idaho Gold Resources Company, LLC
12550 W. Explorer Dr., Suite 100
Boise, ID 83713

Corporation Service Company
Registered Agent for
Stibnite Gold Company
12550 W. Explorer Dr., Suite 100
Boise, ID 83713

> **Re:** *60-Day Notice of Intent to Sue for Violations of the Clean Water Act*

Dear Sirs/Madams:

I write on behalf of the Nez Perce Tribe ("Tribe") to provide legal notice ("Notice") of the Tribe's intent to initiate a federal court lawsuit against Midas Gold Corp., Idaho Gold Resources Company, LLC, Stibnite Gold Company, and Midas Gold Idaho, Inc. (all four related companies, collectively referred to below as "Midas Gold") under section 505(a) of the federal Clean Water Act ("CWA"), 33 U.S.C. § 1365(a), for unauthorized discharges of pollutants at the Stibnite Gold Project ("Project"). This Notice is provided to you in compliance with 33 U.S.C. § 1365(b) and 40 C.F.R. § 135.3(a).

As set forth below, you are discharging arsenic and other pollutants from various sources within the Project that are controlled by Midas Gold. These include several adits, the Bradley tailings pile and the Glory Hole, also known as the Yellow Pine Pit. All of these discharges are ongoing and are without the authorization of a National Pollutant Discharge Elimination ("NPDES") permit. These discharges enter various water bodies, including Meadow Creek, wetlands adjacent to Meadow Creek, Sugar Creek, and the East Fork of the South Fork of the Salmon River ("EFSF"). These water bodies provide habitat for salmon, bull trout, other species of fish,

Notice of Intent to Sue
June 5, 2019
Page 2

and macroinvertebrate communities that support the fish populations. The unauthorized discharges of metals and other pollutants to these water bodies have harmed, and will continue to harm, the fisheries upon which Tribal members rely.

Unless you take the steps necessary to remedy these ongoing violations of the CWA, the Tribe intends to file suit in U.S. District Court following the expiration of the 60-day statutory notice period seeking penalties and declaratory and injunctive relief for your past and ongoing CWA violations.

**The Nez Perce Tribe**

The Tribe is a federally-recognized Indian tribe with headquarters on the Nez Perce Reservation in Lapwai, Idaho.  Since time immemorial, the Tribe has occupied and used over 13 million acres of land now comprising north-central Idaho, southeast Washington, northeast Oregon, and parts of Montana for subsistence, ceremonial, commercial, and religious purposes. In 1855, the United States entered into a treaty with the Tribe.  In this treaty, the Tribe explicitly reserved, and the United States secured, a permanent homeland as well as

> [T]he right of taking fish at all usual and accustomed places in common with the citizens of the Territory; and of erecting temporary buildings for curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land.[1]

The Project is geographically located within the Tribe's aboriginal territory (Exhibit 1); within the area adjudicated by the Indian Claims Commission to have been exclusively used and occupied by the Tribe, *Nez Perce Tribe v. United States,* Docket #175; and in an area over which the Tribe has treaty-reserved rights.

Tribal members, pursuant to their treaty-reserved rights, continue to fish, hunt, gather, and pasture across their vast aboriginal territory and at their traditional places, including areas within and surrounding the proposed Project site and in waters directly downstream of the proposed Project site.  The Payette National Forest lands, on which the Project is partially located, provide irreplaceable habitat for tribal resources including spring/summer Chinook salmon, steelhead, bull trout, west slope cutthroat trout, redband rainbow trout, mountain whitefish, western pearl shell, Rocky Mountain bighorn sheep, North American wolverine, fisher, gray wolf, Clark's nutcracker, whitebark pine, limber pine, bent-flower milkvetch, Sacajawea's bitterroot, and Idaho Douglasia. Many traditional-use resources also occur on Payette National Forest lands, including within the proposed Project area, including: huckleberries, serviceberry, elk thistle, yarrow, wild onion, wild tobacco, Indian hemp, tule, elderberry, chokecherry, Indian tea, Oregon grape, thimbleberry, alder, birch, kowskows, elk, mule deer, moose, and white-tailed deer.  Harm to these resources and their habitat may harm the Tribe and its members.

---

[1] Treaty with the Nez Perces, June 11, 1855, Art. 3, 12 Stat. 957.

Notice of Intent to Sue
June 5, 2019
Page 3

Unfortunately, many of the resources sacred to the Tribe are at risk of disappearing on the Payette National Forest. The EFSF contains three fish species listed as "threatened" under the Endangered Species Act ("ESA") of 1973: Snake River spring/summer Chinook salmon, Snake River steelhead, and bull trout. Mining operations in the 1940s and other habitat disturbances extirpated Spring/summer Chinook salmon in the upper EFSF. All of the EFSR is also designated critical habitat for Snake River spring/summer Chinook salmon, and the EFSF, downstream of the Glory Hole, along with Sugar Creek, is designated critical habitat for Snake River steelhead. The EFSF, Meadow Creek, West End Creek, and Fiddle Creek are also proposed critical habitat for bull trout. As part of the region's ongoing salmon restoration efforts throughout the Columbia River Basin, the Tribe currently outplants fish in the EFSF above the Glory Hole.

The EFSF watershed also includes sensitive native species that have become restricted in distribution and abundance, such as Pacific lamprey and west slope cutthroat trout. Bent-flower milkvetch, which occurs in the proposed Project area, is critically imperiled in Idaho, and the Fish and Wildlife Service has determined that whitebark pine, which also occurs in the proposed Project area, warrants protection under the ESA but that listing the species is precluded by the need to address other, higher priority listing actions. The proposed mine operations and the "Burntlog route" have the potential to disturb and eliminate habitat used by North American wolverine, a species under consideration for ESA listing. And, while several headwater valleys of the EFSF drainage adjacent to the existing disturbed area at the proposed mine site currently provide relatively healthy habitat for the species listed here, Midas Gold's proposed Project would completely backfill them with mining debris, eliminating or severely degrading their wildlife and aquatic habitat.

**The Clean Water Act**

Congress enacted the CWA in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. To advance this goal, Section 301 of the CWA prohibits any "discharge of any pollutant by any person" to waters of the United States ("WOTUS") unless authorized by, and in compliance with, an NPDES permit. 33 U.S.C. § 1311(a); 33 U.S.C. § 1342.

"The centerpiece of the CWA is the NPDES permitting program." *American Iron & Steel Inst. v. EPA*, 115 F.3d 979, 990 (D.C. Cir. 1997). NPDES permits must include conditions that will ensure compliance with the CWA. At a minimum, NPDES permits must include technology-based effluent limits, any more stringent pollution limits necessary to meet water quality standards, and monitoring and reporting requirements. *See* 33 U.S.C. §§ 1311, 1318, and 1342. Once regulated by an NPDES permit, pollution discharges must strictly comply with all of the terms and conditions of that permit. *EPA v. California*, 426 U.S. 200, 205 (1976) ("it is unlawful for any person to discharge a pollutant without obtaining a permit and complying with its terms.")

Notice of Intent to Sue
June 5, 2019
Page 4

The CWA defines "discharge" as "any addition of any pollutant to navigable waters from any
point source." 33 U.S.C. § 1362(12)(A). The CWA defines "point source" to be "any discernible,
confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel,
conduit, well, discrete fissure, container, rolling stock, … from which pollutants are or may be
discharged." 33 U.S.C. § 1362(14). The term "pollutants" is broadly defined in the CWA to
mean "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge,
munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or
discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste
discharged into water." 33 U.S.C. § 1362(6). The CWA defines navigable waters as "the waters
of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

Federal courts have ruled that discharges from mining-related ponds are a point source discharge.
*See, e.g., Sierra Club v. Abston Construction Co., Inc.*, 620 F.2d 41, 45 (5th Cir. 1980) (sump
pits into which miners channeled contaminated runoff and which sometimes overflowed into
U.S. waters were point sources; "Gravity flow, resulting in a discharge of a pollutant into a
navigable water, may be a point source discharge if miner at least initially collected or channeled
the water and other materials."); *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 374 (10th
Cir. 1979); *Consolidation Coal Co. v. Costle*, 604 F.2d 239, 250 (4th Cir. 1979), *rev'd on other
grounds sub nom EPA v. National Crushed Stone Association*, 449 U.S. 64 (1980) (challenge to
regulations on mining wastewater that is "pumped, siphoned or drained from coal storage"
rejected on grounds that definition of point source "excludes unchanneled and uncollected
surface waters."); *Trustees for Alaska v. EPA*, 749 F.2d 549 (9th Cir. 1984) (placer mines held to
be point sources; "[P]oint and non-point sources are not distinguished by the kind of pollution
they create or by the activity causing the pollution, but rather by whether the pollution reaches
the water through a confined, discrete conveyance.")

In addition, federal courts have made clear that waste rock piles, tailings dumps, adits and other
disturbed lands at mine sites are point sources themselves because they act to collect and channel
water contaminated by mine waste. *See, e.g.*, *Washington Wilderness Coalition v. Hecla Mining
Co.*, 870 F. Supp. 983, 988 (E.D. Wash. 1994) (held that a tailing pond is a point source; the
"touchstone for finding a point source is the ability to identify a discrete facility from which
pollutants have escaped."); *Abston Construction*, 620 F.2d at 45 (point source may be present
where miner designed piles of overburden such that, during precipitation, erosion results in a
discharge by means of ditches, gullies, and similar conveyances, even if the miner did nothing
beyond mere collection of rock and other materials); *Beartooth Alliance v. Crown Butte Mines*,
904 F. Supp. 1168 (D. Mont. 1995) (historic discharges from adits and pits held to be point
source discharges, not stormwater); *Idaho Conservation League v. Atlanta Gold Corp.*, 844 F.
Supp. 2d 1116 (D. Idaho 2012) (mining company is liable for discharging arsenic and iron into
creek from historic adit in violation of its NPDES permit).

**Standard for 60-day Notice**

Under 33 U.S.C. § 1365(b), "No action may be commenced … prior to sixty days after the
plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in

Notice of Intent to Sue
June 5, 2019
Page 5

which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order …" In accordance with that requirement, a copy of this Notice is being provided to the U.S. Environmental Protection Agency, the Idaho Department of Environmental Quality, and all of the addressees at the top of this letter and all of those copied at the bottom.

This Notice also complies with 40 C.F.R. section 135.3(a), which states in relevant part:

> Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

The specific violations of the CWA addressed by this Notice are set out below, including the legal basis of the violation, the activity alleged to be in violation, the persons responsible for the alleged violations, and the dates and locations of the alleged violations. *San Francisco BayKeeper v. Tosco Corp.*, 309 F.3d 1153, 1155 (9th Cir. 2002) ("We hold that as long as a notice letter is reasonably specific as to the nature and time of the alleged violations, the plaintiff has fulfilled the notice requirement. The letter does not need to describe every detail of every violation; it need only provide enough information that the defendant can identify and correct the problem.")

### Discharges at Stibnite Mine Subject to NPDES Permitting

The Stibnite Gold Project being run by Midas Gold is comprised of patented and unpatented claims within the larger Stibnite Gold Project area. The unauthorized point source discharges described below all occurred on lands located within Midas Gold patented or unpatented load claims, leased/contracted claims, or patented mill site claims. Midas Gold is responsible for all of the discharges listed below because they are all located on lands within the control of Midas Gold. *See West Virginia Highlands Conservancy, Inc. v. Huffman*, 625 F.3d 159 (4th Cir. 2010) (holding that state agencies engaged in cleanup efforts for reclamation of abandoned coal mining sites must obtain NPDES permits under the CWA, even if they did not create the discharge).

#### *1. The Glory Hole*

The Glory Hole, also known as the Yellow Pine Pit, is located on Midas Gold patented land within the Project area. *See* Exhibit 2 (map). The Glory Hole is a man-made, open pit mining operation that was actively worked from about 1942 to 1952. It was formerly mined for gold, silver, copper, lead, tungsten, and antimony, and approximately 4.5 million tons of ore were removed from the pit prior to its closure about 1952. During active mining, the EFSF was routed around the pit through the Bailey Tunnel but was allowed to return to its natural course through the pit after the Bailey Tunnel was abandoned in 1955. The EFSF now runs through the pit, and

Notice of Intent to Sue
June 5, 2019
Page 6

the pit has for years acted as a settling pond to capture contaminated sediments washing down from upstream sources with the Project area. Significant concentrations of mining-contaminated sediments have built up in the Glory Hole over the years.

The Glory Hole discharges metals downstream on a regular basis. The metals discharging downstream from the Glory Hole come from the pit walls, from pit wall seeps, and from the contaminated sediments in the bottom of the pit. Data collected upstream and downstream of the Glory Hole show it to be a major source of metals contamination to downstream waters. *See* "Occurrence and Transport of Selected Constituents in Streams near the Stibnite Mining Area, Central Idaho 2012-14." United States Geological Survey ("USGS") (2015).

Exhibit 3 (data) shows the known pollutant discharges from the Glory Hole to the EFSF for the period 2012-2016. The calculations of discharges to the EFSF take into account metals loading from sources entering the pit between the two EFSF sampling locations. The Glory Hole is more than just a pass-through of pollutants from upstream; it collects and concentrates contaminated sediments and discharges downstream elevated concentrations of metals leached from those sediments. Water conditions in the pit create chemistry within that pit that are amenable to metals leaching and mobilization of metal. The pit also adds pollutants from leaching of metals from the pit walls and from seeps within the Glory Hole.

The USGS in 2015 estimated that the Glory Hole reach contributed 2,150 pounds of arsenic, 1,010 pounds of antimony, and 617 pounds of dissolved manganese per year into the EFSF. A review of available data collected by Midas Gold shows that the pollutant loads downstream of the Glory Hole are 30% to 50% higher than those measured upstream. The Glory Hole has for years discharged the pollutants listed in Exhibit 3. Given the exposure of the sediments and the pit wall to the water in the Glory Hole and the water chemistry found within the Glory Hole, the reasonable expectation exists that it will continue to discharge those pollutants on a daily basis to the EFSF.

Midas Gold is a "person" as that term is defined in 33 U.S.C. § 1362(5) ("The term 'person' means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body.") Midas Gold owns the patented claims within which the Glory Hole sits, and it has control over all discharges from the Glory Hole. Midas Gold has conducted exploratory drilling in and around the Glory Hole and has plans to remine this area to extract more ore from it. Consequently, it has responsibility for the discharges from the Glory Hole.

The Glory Hole is a confined, discrete conveyance of pollutants to WOTUS and is therefore a point source as that term is defined in 33 U.S.C. § 1362(14).

Monitoring shows that the Glory Hole has discharged concentrations of antimony, arsenic, iron, and manganese on numerous occasions into the EFSF. Upon information and belief, those discharges occur on a daily basis and are on-going. Those discharges constitute discharges of pollutants as those terms are used in 33 U.S.C. § 1362(6), (12), and (16).

Notice of Intent to Sue
June 5, 2019
Page 7

These discharges from the Glory Hole are not authorized by a NPDES permit and are not otherwise exempt from the permitting requirements of the CWA.

The EFSF is a perennial tributary of the Salmon River, which is a navigable-in-fact water body. The EFSF is a navigable water under 33 U.S.C. § 1362(7), a water of the United States under 40 C.F.R. § 230.3, and it meets all of the criteria for jurisdiction under the 2008 EPA/Corps *Rapanos* Guidance. EPA/USACOE, "Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States*" (December 2, 2008).

### 2. *The Bradley Tailings Pile*

The Bradley Tailings Pile, also known as the Historic Tailings and Spent Ore Disposal Area, ("Tailings Pile") is located on Midas Gold patented land. It is a historic tailings deposit site located upstream of the Glory Hole, adjacent to Meadow Creek. *See* Exhibit 2 (map).

The Tailings Pile is comprised of mine tailings that contain high concentrations of arsenic, cyanide, and other pollutants. The downstream end of the Tailings Pile is constrained by a man-made structure known as the Keyway Dam. The Tailings Pile is not capped, so rain and snow melt infiltrate the Tailings Pile and come into contact with the fine tailings where they leach pollutants, including arsenic, and discharge those contaminated waters through the Keyway Dam into a wetland. The wetland is also referred to as the Keyway Marsh.

There are at least three surface discharge points from the Keyway Dam, and others may exist subsurface. *See* Exhibit 4 (representative photos). Midas Gold has labeled these three discharge points as sample areas YP-S-6, YP-S-7, and YP-S-8. *See* Exhibit 5 (map showing sampling locations). These discharges from the Keyway Dam flow across the surface of and through the Keyway Marsh and enter Meadow Creek a short distance from the base of the Keyway Dam. Midas Gold's sampling data showing discharges from these three sampling points are summarized in Exhibit 6.

The discharges from the Tailings Pile flow on the surface to and through the Keyway Marsh. From the Keyway Marsh, they discharge into Meadow Creek. *See* Exhibit 7 (representative photos). The Keyway Marsh outlet sampling point is designated YP-S-10. The data in Exhibit 8 (data) show that each time the discharges from the Keyway Marsh are sampled, they contain elevated levels of arsenic and other pollutants. Upon information and belief, the outlet has flowed on a daily basis for years. Given the structure of the Tailings Pile, the reasonable expectation exists that it will continue to discharge to Meadow Creek until appropriate control measures are installed. *See Id.*

The Keyway Marsh is a wetland as defined under 33 C.F.R. § 328.3(b) and under the 1987 Corps of Engineers Wetlands Manual. It directly abuts, and is adjacent to, Meadow Creek and shares both surface and subsurface hydrological connections with Meadow Creek. *See* Exhibits 7(a) and (b) (wetland index and Meadow Creek Sheet 18 maps).  Meadow Creek is a perennial tributary

Notice of Intent to Sue
June 5, 2019
Page 8

of the EFSF, which flows into the Salmon River, a navigable-in-fact water body. The Keyway
Marsh and the adjacent Meadow Creek into which the Tailings Pile discharges are both
navigable waters under 33 U.S.C. § 1362(7) and WOTUS under 40 C.F.R. § 230.3, and they both
meet all of the criteria for jurisdiction under the 2008 EPA/Corps *Rapanos* Guidance.
EPA/USACOE, "Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in
*Rapanos v. United States & Carabell v. United States*" (December 2, 2008).

The Tailings Pile itself and the seeps from its toe (the Keyway Dam) are confined, discrete
conveyances of pollutants to WOTUS and are therefore point sources as that term is defined in
33 U.S.C. § 1362(14).

Midas Gold is a "person" as that term is defined in 33 U.S.C. § 1362(5). Midas Gold owns the
patented claims on which the Tailings Pile sits, and it has control over all discharges from the
Pile. Midas Gold has conducted exploratory drilling in and around the Tailings Pile and has plans
to use this area for its future mining operations. Consequently, it has responsibility for the
operation and maintenance of the Tailings Pile.

The Tailings Pile discharges elevated concentrations of arsenic and other pollutants on a daily
basis, and can reasonably be expected to continue to discharge. Those discharges constitute
discharges of pollutants as those terms are used in 33 U.S.C. § 1362(6), (12), and (16).

These discharges from the Tailings Pile are not authorized by an NPDES permit and not
otherwise exempt from the permitting requirements of the CWA.

### 3.  *Hangar Flats Tailings Pile*

The Hangar Flats Tailings Pile is located on Midas Gold patented land. It is a historic tailings
deposit site that sits just northwest and downstream of the Bradley Tailings Pile and is also
adjacent to Meadow Creek. *See* Exhibit 2 (map).

The Hangar Flats Tailings Pile is comprised of mine tailings that contain high concentrations of
arsenic and other pollutants. The Hangar Flats Tailings Pile is not capped so rain and snow melt
infiltrate the pile, come into contact with the fine tailings, and leach pollutants, including high
concentrations of arsenic, through two seeps. These two seeps have been labeled sample areas
YP-S-5 and YP-T-23A. Both seeps have been documented to flow into the flood plain of
Meadow Creek multiple times during high water events. In 2014, YP-T-23A was documented
flowing into Meadow Creek. *See* Exhibit 9 (representative photos). Upon information and belief,
the Hangar Flats Tailings Pile has discharged to the hydrologically-connected Meadow Creek
floodplain and to Meadow Creek on numerous occasions in the past and will continue to
discharge to Meadow Creek.

Water quality data from both seeps indicate high concentrations of arsenic and other pollutants
originating from the Hangar Flats Pile. Contaminated water from these two seeps has reached the

Notice of Intent to Sue
June 5, 2019
Page 9

floodplain of Meadow Creek on multiple occasions and has been seen flowing into Meadow Creek on at least one occasion. *See* Exhibit 10 (data).

The Meadow Creek flood plain is hydrologically-connected to Meadow Creek and shares both surface and subsurface hydrological connections with Meadow Creek. Meadow Creek is a perennial tributary of the EFSF which flows into the Salmon River, which is a navigable-in-fact water body. Meadow Creek, into which the Hangar Flats Tailings Pile discharges, is a navigable water under 33 U.S.C. § 1362(7) and WOTUS under 40 C.F.R. § 230.3, and it meets all of the criteria for jurisdiction under the 2008 EPA/Corps *Rapanos* Guidance. EPA/USACOE, "Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States*" (December 2, 2008).

The Hangar Flats Tailings Pile itself and the seeps from its toe are confined, discrete conveyances of pollutants to WOTUS and are therefore point sources as that term is defined in 33 U.S.C. § 1362(14).

Midas Gold is a "person" as that term is defined in 33 U.S.C. § 1362(5). Midas Gold owns the patented claims on which the Hangar Flats Tailings Pile sits, and it has control over all discharges from the Hangar Flats Tailings Pile. Midas Gold has conducted exploratory drilling in and around the Hangar Flats Tailings Pile and has plans to use this area for its future mining operations. Consequently, it has responsibility for the operation and maintenance of the Hangar Flats Tailings Pile.

The Hangar Flats Tailings Pile discharges elevated concentrations of arsenic and other pollutants on a regular basis. Those discharges constitute discharges of pollutants as those terms are used in 33 U.S.C. § 1362(6), (12), and (16).

These discharges from the Hangar Flats Tailings Pile are not authorized by an NPDES permit and not otherwise exempt from the permitting requirements of the CWA.

### 4. The Bailey Tunnel

The Bailey Tunnel was constructed in about 1943 to divert the EFSF around the Glory Hole and into Sugar Creek. It has been abandoned since 1955, but it continues to discharge contaminated mine drainage into Sugar Creek. *See* Exhibit 11 (representative photos). Midas Gold has designated the Bailey Tunnel as sample location YP-AS-2. The Bailey Tunnel is located on patented land owned by Midas Gold Corp. *See* Exhibit 12 (map).

Monitoring data for the Bailey Tunnel shows that the discharges from the Bailey Tunnel consistently and on numerous occasions contain arsenic and other pollutants. *See* Exhibit 13 (data). The discharges from the Adit enter Sugar Creek. Given the nature of gravity flow of water through the Adit, the unauthorized discharges from the Adit can reasonably be expected to continue until appropriate control measures are installed.

Notice of Intent to Sue
June 5, 2019
Page 10

Midas Gold owns the patented claims within which the Bailey Tunnel sits, and it conducted drilling in the vicinity. Midas Gold has control over and responsibility for the operation and maintenance of the Adit.

The Bailey Tunnel is a confined and discrete conveyance of pollutants to WOTUS and is therefore a point source as that term is defined in 33 U.S.C. § 1362(14).

The Bailey Tunnel discharges arsenic and other pollutants on a regular basis and will continue to discharge pollutants into Sugar Creek until proper control measures are installed. Those discharges constitute discharges of pollutants as those terms are used in 33 U.S.C. § 1362(6), (12), and (16).

Sugar Creek is a tributary of the EFSF, which is a perennial tributary of the Salmon River, a navigable water body. Sugar Creek is a navigable water under 33 U.S.C. § 1362(7), a water of the United States under 40 C.F.R. § 230.3, and it meets all of the criteria for jurisdiction under the 2008 EPA/Corps *Rapanos* Guidance. EPA/USACOE, "Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States*" (December 2, 2008).

The Bailey Tunnel discharges are not authorized by an NPDES permit and are not otherwise exempt from CWA permitting requirements.

### *5. The DMEA Adit and DMEA Waste Rock Seep*

The DMEA Adit is located between the Glory Hole and the Bradley Tailings Pile on an unpatented Midas Gold claim. The DMEA Adit infiltrates into the DMEA Waste Rock Dump, and emerges as a seep at the toe of the DMEA Waste Rock Dump, which flows into the EFSF. These discharge points are designated as sample points YP-AS-6 and YP-T-17. *See* Exhibit 12 (map) and Exhibit 14 (representative photos).

Discharges from the DMEA Adit and Waste Rock Dump to the EFSF contain arsenic and other metals. These discharges occur on a regular basis. *See* Exhibit 15 (data). Those discharges constitute discharges of pollutants as those terms are used in 33 U.S.C. § 1362(6), (12), and (16). The DMEA Adit and the Waste Rock Dump are confined and discrete conveyances of pollutants to WOTUS and are therefore point sources as that term is defined in 33 U.S.C. § 1362(14). Given the nature of gravity flow of water through the DMEA Adit and the porous Waste Rock Dump, the unauthorized discharges from the DMEA Adit and Waste Rock Seepcan reasonably be expected to continue until appropriate control measures are installed.

The EFSF is a perennial tributary of the Salmon River, which is a navigable-in-fact water body. The EFSF is a navigable water under 33 U.S.C. § 1362(7), a water of the United States under 40 C.F.R. § 230.3, and it meets all of the criteria for jurisdiction under the 2008 EPA/Corps *Rapanos* Guidance. EPA/USACOE, "Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States*" (December 2, 2008).

Notice of Intent to Sue
June 5, 2019
Page 11

Midas Gold has asserted its rights to the unpatented claims within which the DMEA Adit and
Waste Rock Dump sit and has conducted drilling in the near vicinity. Midas Gold has control
over, and responsibility for, the discharges from the DMEA Adit and Waste Rock Dump.The
DMEA Adit discharges are not authorized by an NPDES permit and are not otherwise exempt
from CWA permitting requirements.

### 6. The Bonanza Adit

The Bonanza Adit discharges to the floodplain of Sugar Creek, which is a perennial tributary of
the EFSF. The Bonanza Adit is designated as sample point YP-AS-1. *See* Exhibit 12 (map).
Representative photos of the Bonanza Adit discharge are set out in Exhibit 16.

The Bonanza Adit has been measured to discharge elevated concentrations of arsenic and other
pollutants into the Sugar Creek floodplain on several occasions. *See* Exhibit 17 (data). Upon
information and belief, the Adit discharges reach Sugar Creek through shallow subsurface
hydrologic connections. Given the nature of gravity flow of water through the Adit, the
unauthorized discharges from the Adit can reasonably be expected to continue until appropriate
control measures are installed.

Midas Gold owns the rights to the unpatented claims within which the Bonanza Adit sits and has
conducted drilling in the near vicinity. The company has control over and responsibility for
discharges from the Adit.

The Bonanza Adit is a confined and discrete conveyance of pollutants to WOTUS and is
therefore a point source as that term is defined in 33 U.S.C. § 1362(14).

The Bonanza Adit discharges arsenic and other pollutants on a regular basis. Those discharges
constitute discharges of pollutants as those terms are used in 33 U.S.C. § 1362(6), (12), and (16).

Sugar Creek is a tributary of the EFSF, which is a perennial tributary of the Salmon River, a
navigable-in-fact water body. Sugar Creek is a navigable water under 33 U.S.C. § 1362(7), a
water of the United States under 40 C.F.R. § 230.3, and it meets all of the criteria for jurisdiction
under the 2008 EPA/Corps *Rapanos* Guidance. EPA/USACOE, "Clean Water Act Jurisdiction
Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United
States*" (December 2, 2008).

The Bonanza Adit discharges are not authorized by an NPDES permit and are not otherwise
exempt from CWA permitting requirements.

### 7. The Cinnabar Tunnel

The entrance to the Cinnabar Tunnel, which Midas Gold designates as sample point YP-AS-4, is
located upstream of the Glory Hole adjacent to the EFSF on one of Midas Gold's unpatented

Notice of Intent to Sue
June 5, 2019
Page 12

claims within the larger Project area. Midas Gold has conducted drilling in the near vicinity. The Cinnabar Tunnel discharges to the EFSF in at least three discrete areas. *See* Exhibit 12 (map). Representative photos of the discharge are attached in Exhibit 18.

The Cinnabar Tunnel discharges arsenic and antimony into the EFSF on a regular basis. *See* Exhibit 19 (data). Given the nature of gravity flow of water through the tunnel, the unauthorized discharges from the tunnel can reasonably be expected to continue until appropriate control measures are installed.
Midas Gold has control over and responsibility for discharges from the Adit.

The Cinnabar Tunnel is a confined and discrete conveyance of pollutants to WOTUS and is therefore a point source as that term is defined in 33 U.S.C. § 1362(14).

The Cinnabar Tunnel discharges arsenic and antimony to the EFSF on a regular basis. Those discharges constitute discharges of pollutants as those terms are used in 33 U.S.C. § 1362(6), (12), and (16).

The EFSF is a perennial tributary of the Salmon River, which is a navigable-in-fact water body. The EFSF is a navigable water under 33 U.S.C. § 1362(7), a water of the United States under 40 C.F.R. § 230.3, and it meets all of the criteria for jurisdiction under the 2008 EPA/Corps *Rapanos* Guidance. EPA/USACOE, "Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States*" (December 2, 2008).

The Cinnabar Tunnel discharges are not authorized by an NPDES permit and are not otherwise exempt from CWA permitting requirements.

### 8. *The Meadow Creek Adit*

The Meadow Creek Adit, which Midas Gold has designated at sample point YP-AS-7, is located upstream of the Glory Hole, adjacent to Meadow Creek. The Meadow Creek Adit discharges to the EFSF via overland flow during times of high flow. The Meadow Creek Adit is located on patented land owned by Midas Gold. *See* Exhibit 12 (map). Exhibit 20 contains representative photos of the discharge.

Monitoring data for the Meadow Creek Adit shows that it has discharged arsenic and other pollutants into the EFSF. *See* Exhibit 21 (data). Given the nature of gravity flow of water through the Meadow Creek Adit, its unauthorized discharges can reasonably be expected to continue until appropriate control measures are installed.

Midas Gold owns the patented claims within which the Meadow Creek Adit sits and has conducted drilling in the near vicinity. Midas Gold has control over and responsibility for the discharges from the Meadow Creek Adit.

Notice of Intent to Sue
June 5, 2019
Page 13

The Meadow Creek Adit is a confined and discrete conveyance of pollutants to WOTUS and is therefore a point source as that term is defined in 33 U.S.C. § 1362(14).

The Meadow Creek Adit discharges arsenic and other pollutants into the EFSF. Those discharges constitute discharges of pollutants as those terms are used in 33 U.S.C. § 1362(6), (12), and (16).

The EFSF is a perennial tributary of the Salmon River, which is a navigable-in-fact water body. The EFSF is a navigable water under 33 U.S.C. § 1362(7), a water of the United States under 40 C.F.R. § 230.3, and it meets all of the criteria for jurisdiction under the 2008 EPA/Corps *Rapanos* Guidance. EPA/USACOE, "Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in *Rapanos v. United States & Carabell v. United States*" (December 2, 2008).

The Meadow Creek Adit discharges are not authorized by an NPDES permit and are not otherwise exempt from CWA permitting requirements.

**Party Giving Notice**

The person giving notice here is:

> Shannon F. Wheeler, Chairman
> Nez Perce Tribe
> P.O. Box 305
> Lapwai, ID 83540
> nptec@nezperce.org

**Conclusion**

If Midas Gold continues to discharge from the above-identified point sources without NPDES permits, the Tribe intends to file suit in Federal District Court. We are providing this letter to comply with the CWA Section 505(b) notice requirements and in the hope of preventing future violations of the CWA and further degradation of water quality in the EFSF and its tributaries, which are important historic fishing grounds for Tribal members.

One of the purposes of the CWA Section 505(b) notice requirements is to remedy and cure the underlying violations short of litigation. This 60-day notice period also provides an opportunity for the parties to discuss resolution of these violations; the Tribe's legal staff will be available to discuss resolution of the matters set out in this letter.

Sincerely,

FOR: Mr. Shannon F. Wheeler
Chairman

Notice of Intent to Sue
June 5, 2019
Page 14


cc:      Mr. Andrew Wheeler, Administrator
         U.S. EPA
         1200 Pennsylvania Avenue, N.W.
         Mail Code: 1101A
         Washington, D.C. 20460

         Mr. Chris Hladick, Regional Administrator
         U.S. EPA, Region 10
         1200 Sixth Avenue
         Mail Code: 21-B03
         Seattle, WA 98101

         Mr. James Werntz, Director
         U.S. EPA, Idaho Operations Office
         950 W. Bannock, Suite 900
         Mail Code: IOO
         Boise, ID 83702

         Ms. Allyn Stern, Regional Counsel
         U.S. EPA, Region 10
         1200 Sixth Avenue
         Mail Code: 11-C07
         Seattle, WA 98101

         Mr. John Tippets, Director
         Idaho Department of Environmental Quality
         1410 N. Hilton Street
         Boise, ID 83706

         Mr. Gary Spackman, Director
         Idaho Department of Water Resources
         PO Box 83720
         Boise, ID  83720-0098

         Ms. Laurel Sayer, President
         Midas Gold Idaho, Inc.
         405 S. 8th Street, Suite 201
         Boise, ID 83702

         Mr. Anthony Botello, District Ranger
         Payette National Forest
         500 North Mission Street
         McCall, ID 83638

Notice of Intent to Sue
June 5, 2019
Page 15


Mr. Keith Lannom, Forest Supervisor
Payette National Forest
500 North Mission Street
McCall, ID 83638


List of Exhibits

| | |
|---|---|
| 1 | Nez Perce Tribal Boundaries map |
| 2 | Map of patented Stibnite Mine patented claims |
| 3 | Glory Hole discharge data |
| 4 | Keyway Dam photos |
| 5 | Bradley Tailings Pile sample locations |
| 6 | Keyway Dam seeps data |
| 7 | Keyway Marsh photos |
| 8 | Keyway Marsh outlet data |
| 9 | Hangar Flats photos |
| 10 | Hangar Flats seep data |
| 11 | Bailey Tunnel Adit data |
| 12 | Map showing sampling points for adits and tunnels |
| 13 | Bailey Tunnel Adit Data |
| 14 | DMEA seep photos |
| 15 | DMEA seep data |
| 16 | Bonanza Adit photos |
| 17 | Bonanza Adit data |
| 18 | Cinnabar Tunnel photos |
| 19 | Cinnabar Tunnel data |
| 20 | Meadow Creek adit photos |
| 21 | Meadow Creek adit data |